**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VIRGINIA
(Alexandria Division)**

| | |
|---|---|
| ADVOCACY HOLDINGS, INC., | |
| *Plaintiff,* | |
| v. | Case No. 1:23-cv-419 |
| CHAZZ CLEVINGER, | **JURY TRIAL DEMANDED** |
| **Serve:** Mr. Chazz D. Clevinger<br> 9030 Timberwolf Court<br> Vienna, Virginia 22182 | |
| *Defendant.* | |

## VERIFIED COMPLAINT

Plaintiff Advocacy Holdings, Inc., which does business as OneClickPolitics ("OCP"), by counsel and pursuant to Rule 3 of the Federal Rules of Civil Procedure, files this verified complaint against Defendant Chazz Clevinger. For its verified complaint, OCP states as follows:

### Introduction

1.      This is an action to stop the theft of a significant amount of OCP's core business by its former Chief Executive Officer who abruptly resigned less than two months ago. In gross and brazen violation of his contractual (noncompete) and fiduciary obligations to OCP, Defendant Clevinger established two competing companies *while he was OCP's CEO*, stolen and destroyed massive amounts of OCP corporate data, solicited as many of OCP's clients as possible, disparaged OCP, and, as a result, aggressively stole almost $1 million of OCP's business in that short period of time.

2.      Over the past five years, OCP has become the nation's leading digital advocacy

servicer.  It offers an online platform to companies to lobby governmental leaders.  It also offers advocate acquisition services (and actions), advocacy consulting, and bill tracking services.

3.      While Defendant Clevinger was CEO of OCP, he secretly established two companies to begin his transition of OCP clients to his own.  As further detailed in this verified complaint, Defendant Clevinger's new company – CiviClick – launched on March 1, 2023.  It offers nearly identical services as OCP.  Indeed, Defendant Clevinger has tried to sell his CiviClick business as "the new product" in lieu of OCP's products.  Because he was CEO of OCP for five years, Defendant Clevinger became a well-known salesman in the digital advocacy industry.  Unfortunately, he has used his OCP opportunity to promote a nearly-identical business at the direct loss of OCP.  OCP cannot permit its former CEO to steal its data, customers, strategies, and hard earned relationships.

4.      OCP respectfully requests that this Court grant immediate and permanent relief enjoining Defendant Clevinger's unlawful conduct, and to award OCP damages in the amount it has lost in business as well as punitive damages for Defendant Clevinger's premeditated plan to put OCP out of business.

**Parties**

5.      Plaintiff OCP is a corporation organized under Delaware law.  OCP's principal place of business is located at 1 North Wacker Drive, Suite 3601 in Chicago, Illinois.  OCP maintained an office in Washington, D.C. until very recently.  OCP is, therefore, a citizen of the State of Delaware and the State of Illinois for diversity purposes.

6.      Defendant Clevinger is an individual who currently resides at 9030 Timberwolf Court in Vienna, Virginia.  Defendant Clevinger is a nationally known executive and salesman in the digital advocacy spaces.  He has over 45,000 followers on Instagram, evidencing his high

profile in the political advocacy industry.  He has been a resident and domiciliary of Virginia since 2011.  Defendant Clevinger is a citizen of the Commonwealth of Virginia for diversity jurisdiction purposes.

### Jurisdiction and Venue

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive or interest and costs, and is between citizens of different states.  Specifically, the amount in controversy exceeds $980,000 (not including punitive damages, costs, or fees), and is between OCP (a citizen of Delaware and Illinois) and Defendant Clevinger (a citizen of Virginia).

8.      This Court has general personal jurisdiction over Defendant Clevinger because he has been domiciled in the Commonwealth of Virginia at all relevant times and for at least six months preceding the initiation of this lawsuit.  In addition, this Court has specific personal jurisdiction over Defendant Clevinger pursuant to VA. CODE. § 8.01-328.1, and this Court's exercise of personal jurisdiction over each defendant is consistent with the Due Process Clause of the United States Constitution.

9.      The United States District Court for the District of Virginia (Alexandria Division) is a proper venue pursuant to 28 U.S.C. § 1391 because it is the judicial district in which Defendant Clevinger resides.

### Statement of Facts

### I.      One Click Politics and Its Business.

10.      OCP is the leading non-partisan, grassroots advocacy technology, advocate acquisition, and grassroots campaign management company.  It is in the business of providing innovative and affordable digital grassroots advocacy software to enhance and improve the

effectiveness of direct lobbying campaigns with the goal of impacting policy outcomes.

11.    OCP was conceived in 2010 to offer the average citizen a mechanism to conveniently communicate with all (or a subset) of the members of Congress via email with "one click."  For example, one email could be sent to all 535 members of Congress with a single click. In approximately 2015, OCP shifted its business model to provide similar services to entities in addition to citizens.  These entities (non-profits, associations, companies, and agencies) often lobby Congress about a myriad of issues.  OCP filled the need to facilitate the "grassroots advocacy" component of their broader public and government relations efforts.

12.    OCP's customers currently include hundreds of non-profit organizations, associations, companies, and agencies.  These clients depend on OCP's strategic insights, acquisition services, and award-winning advocacy technology to achieve a measurable impact on policy outcomes at the local, state, provincial, and federal levels of government in the United States, Canada, and Australia.  Over the last 3 years, OCP has served more than 500 customers generating approximately $10 million in revenue.

13.    OCP's business primarily consists of selling access to its subscription-based online advocacy platform, advocate acquisition services, bill tracking services, and advisory services.

A.    **OCP's Popular Digital Advocacy Software.**

14.    OCP sells access to its digital advocacy software on an annual subscription basis. This software, among other things, enables a customer's advocates to send written messages to members of Congress.  OCP developed, enhances, and maintains this software.  This software is proprietary to OCP.

15.    OCP's advocacy software includes the following features:

    (a) **Integrated Email (Email Blasts)**: OCP's email tools allows customers to send customized email messages to their advocates. This tool is complete with customizable templates, list management and features such as A/B testing to ensure

optimum engagement.

(b) **Prefilled Webforms**: The OCP platform auto populates a webform with an advocate's data into a customizable webform which helps increase advocate conversion rate by reducing the time required to take action.

(c) **Legislator Search**: OCP provides a searchable legislator database that allows customers to identify and target lawmakers at all levels of governments.

(d) **Biographies**: OCP has biographies of federal and state legislators, local mayors and city councilmembers, and state governors as well as state/provincial and federal databases for Canada and Australia.

(e) **Congressional Staff Directory**: OCP's software includes a directory to chiefs of staff, communications directors, press secretaries, legislative directors, state/district directors, legislative assistants, and legislative correspondents.

(f) **Custom Recipients**: OCP allows users to target custom recipients by email, phone and Twitter.

(g) **Action Center**: The OCP platform provides managed advocacy web pages created by its internal team of experts. OCP works with customer teams to design web pages that help drive advocate action.

(h) **Message Rotator**: The OCP platform enables auto randomizing of message text with unlimited subject lines and message bodies (with configurable targeting by party affiliation) to significantly decrease the potential for a message to be flagged as a "form email" by legislative staff.

(i) **Multi-Action Tool:** The OCP platform leverages "One-Click" actions that enable the simultaneous and instant submission of email, fax, Facebook and Twitter messages to elected officials with "One Click" of a button.

(j) **Video Messaging:** The OCP platform enables advocates to use the camera in their iPhone, Android, tablet, laptop, or desktop to record up to 30 second video messages that can be sent directly to elected officials. These videos are submitted into a queue for approval prior to delivery to elected officials to ensure quality control.

(k) **Patch Through Calling:** The OCP platform connects advocates with elected officials through an integrated voice phone call platform where advocacy calls are tracked by advocate, legislators contacted, and call duration. This functionality is further enhanced by allowing customers to record a custom voice greeting with instructions for their advocates.

(l) **Text Messages and Mobile Keywords:** The OCP platform enables advocates who text OCP customers to receive links to automated action alerts, surveys, or fundraising appeals. In addition, OCP advocacy tools are mobile responsive so

advocates can take action directly from their iPhone, Android, or tablet.

(m) **Photo messaging:** The OCP platform enables advocates to upload personalized pictures of themselves to create a digital campaign card which create a unique, personalized interaction with elected officials by delivering personalized campaign cards from OCP customers advocates digitally or via hard copy.

(n) **Campaign Activity Analytics**: The OCP platform monitors messaging traffic and advocate actions by activity, campaign, date range, legislators contacted.

(o) **Advocate Profiles**: The OCP platform enables customers to import, collect, track and analyze individual activity data on all of their advocates and track engagement across campaigns on an advocate's individual activity timeline.

(p) **State/Federal Advocate Maps:** The OCP platform enables customers to track engagement across campaigns on an advocate's individual activity timeline and target advocates based on location for district-specific "calls to action" or regional town-hall events.

(q) **Sub Accounts:** The OCP platform enables coalition partners, state and regional level affiliates to track collective advocate activity metrics from national headquarters and monitor the activities of regional, state, or local affiliate chapters as well as coalition partners.

(r) **Integrations:** The OCP platform integrates with multiple Customer Relationship Management (CRM) platforms and Association Management Systems (AMS) including Salesforce, Neon, NationBuilder, and iMIS to enable deep integration between OCP and customer advocate data/messaging activity.

16.     An annual subscription to OCP's proprietary software ranges from $2,500 to $100,000.  This subscription price depends on the type and size of the customer organization, complexity and number of the campaigns, and the number of messages sent.

**B.     OCP's Advocate Acquisition Services.**

17.     OCP also sells "advocate acquisition services" to provide customers with advocates.  Some customers (e.g., the American Fur Federation) do not maintain a contact list of grassroots advocates, so they need to identify advocates when they run a grassroots campaign to lobby the federal or a state legislature vis-à-vis a bill (e.g., outlawing the sale of furs).  Other customers, who may have a large number of advocates (e.g., the American Pharmacists

Association) may still need additional advocates in a specific state depending on the campaign. These advocates are identified such that they are likely to take immediate action on a campaign.

18.     OCP provides these advocate acquisition services via third-party providers.  OCP defines the parameters of the target advocates to the third-party provider who then identifies the advocates (via digital ad placement technology) for OCP to deliver to its customer.  Combined with OCP's software, these advocates take action on the customer's campaign. OCP makes a profit off this service.

19.     OCP sells acquisition work on a per advocate basis and ranges from $1.00 - $4.00 per advocacy activity (e.g., messaging, etc.).

**C.     OCP's Bill Tracking Services.**

20.     OCP also sells bill tracking services to enable customers to research and track the status of legislation and regulations in all 50 states.  This includes providing the full text of every bill, custom alerts regarding amendments, votes and hearing schedules, as well as custom reports.

21.     OCP provides these bill tracking services via a third-party provider.  OCP bundles the bill tracking service with its software service and makes a profit.

22.     OCP sells bill tracking services between $500 and $5,000 per year depending upon the customer.

**D.     OCP's Advisory Services.**

23.     OCP also sells advisory services to provide customers with grassroots consulting and campaign management.   This includes providing grassroots strategy and campaign management services to augment customers' grassroots programs, while allowing customers to monitor success from within the OCP software application

24.     OCP provides these advisory services on an hourly basis or as part of a broader subscription agreement.  OCP makes a profit on these services.

25.    OCP sells advisory services at an hourly rate of between $350 and $500 per hour.

**II.    Defendant Clevinger's Employment With and Resignation From OCP.**

**A.    Defendant Clevinger's Employment with OCP.**

26.    Defendant Clevinger joined OCP as Vice President in November 2016 and was named Chief Executive Officer ("CEO") in November 2017.

27.    As OCP's CEO, Defendant Clevinger had unfettered access to OCP's (1) business and marketing plans, practices, and strategies; (2) internal methods of operation, techniques, systems, and processes; (3) customer, supplier, and vendor information (including contact lists), and their business dealings with OCP; (4) confidential cost, pricing, sales, and other financial information (including budgets, projections, targets, revenues, margins, and profits); (5) customer, supplier, vendor, and other third-party contracts, negotiations, bids, proposals, needs and preferences; (6) product development and testing information; (7) technical information, including computer hardware and software, research and development, inventions, discoveries and other intellectual property; (8) product and technology roadmaps, and (9) personnel information, including compensation and benefits information.

28.    On a day-to-day basis, as OCP's CEO, Defendant Clevinger led and managed OCP's sales and marketing operations, which includes recruiting, hiring, and training sales executives, business development representatives, lead generation associates, and marketing resources.  In addition, Defendant Clevinger also managed all aspects of OCP's Google Adwords lead generation activity including keywords, budgets, and bidding strategies. Defendant Clevinger also distributed leads to the sales team as well as reached out to potential customers directly to demonstrate and sell the OCP software, advocacy acquisition services, bill tracking services, and advisory services. Defendant Clevinger also generated OCP's leads and opportunities through attendance at industry conferences and events as well as from referrals from other OCP customers

and inbound calls (which were routed directly to his cell phone).  Defendant Clevinger was responsible for ensuring monthly sales targets were met and customer invoices paid.

29.     Defendant Clevinger also led and managed OCP's customer service operations including establishing processes and procedures, triaging customer issues, and interacting as required with customers, OCP customer service representatives, and OCP's technology team.

30.     Furthermore, Defendant Clevinger interacted with the OCP's technology team on a weekly basis to ensure customer requirements and enhancements were on track, describe technical issues and bugs, and plan next generation product features.

31.     In short, as OCP's CEO, Defendant Clevinger was OCP's primary business development and customer service interface, and he had unlimited access to OCP's technology, strategies, and everyday aspects of the business.

**B.      Defendant Clevinger's Noncompete Agreement.**

32.     On July 15, 2021, OCP required Defendant Clevinger to sign a Non-Competition, Non-Solicitation and Non-Disclosure Agreement ("Noncompete Agreement," attached as **Exhibit 1**).

33.     The Noncompete Agreement prohibits Defendant Clevinger from:

> … directly or indirectly through another person or entity or by assisting others: (a) fund, own, invest in, set up or start a Competing Business located in the United States; or (b) become employed by, work for or otherwise provide services to or on behalf of a Competing Business, in the United States, to the extent such employment, work or services involves executive management or sales responsibilities or duties.

**Exhibit 1** at 3 ¶ 4.

34.     It also prohibits Defendant Clevinger from:

> … directly or indirectly through another person or entity or by assisting others: (a) solicit, call upon or contact any [customer or vendor with whom OCP had done business in the last 12 months] for the purpose of engaging in Competitive Business Activity; (b) contract with, sell to or perform service for or on behalf of [an OCP customer or vendor] in

connection with Competitive Business Activity; or (c) divert, interfere with, or attempt to divert or interfere with, [OCP's] business relationship with any [OCP customer or vendor].

**Exhibit 1** at 3 ¶ 5.

35.     Finally, the Noncompete Agreement prohibits Defendant Clevinger from:

… directly or indirectly, through another person or entity, or by assisting others: (a) solicit, induce or encourage any [OCP employee] to terminate his or her employment or other association with [OCP]; or (b) hire or attempt to hire any [OCP employee] on behalf of a person or entity engaged in Competitive Business Activity.

**Exhibit 1** at 3 ¶ 6.

36.     The Noncompete Agreement prohibited competitive and solicitation activities for twelve months.  **Exhibit 1** at 3 ¶¶ 4-5.  The Noncompete Agreement, however, also explicitly tolls the twelve-month noncompete and non-solicitation period once OCP commenced legal proceedings to enforce those provisions.  **Exhibit 1** at 3 ¶ 7.

C.     **Defendant Clevinger's Abrupt Resignation from OCP**

37.     With absolutely no prior notice or indication, Defendant Clevinger abruptly resigned his CEO position with OCP on February 1, 2023.

38.     His stated reason for termination was that he was the "victim of an aggravated criminal assault" by one of OCP's governors on January 17, 2023, after a day-long business and product strategy and planning meeting.  Defendant Clevinger's allegation that he was assaulted is patently false.  Instead, on January 17, 2023, members of OCP's governance took Defendant Clevinger to an expensive steak dinner in Chicago.  After dinner, OCP officials drove Defendant Clevinger to his hotel.  All parties parted amicably that evening, and there were no disagreements or arguments that day.

39.     Before he resigned, Defendant Clevinger took affirmative and malicious steps to delete, modify, and destroy important and irreplaceable OCP data and assets.

40.     Specifically, on the day he resigned (February 1, 2023), Defendant Clevinger deleted several OCP user (i.e., employee or independent contractor) accounts, which in turn deleted all user information, including, but not limited to, email, files, calendar entries, and contacts for that user.

41.     Beginning at 10:28 a.m. on February 1, 2023, Defendant Clevinger deleted the OCP user accounts of Mr. Chris Tosto (Director of Strategic Services), Mr. Andrew Tucker (Senior Account Executive), and Ms. Dionne Williams (Marketing Manager).

42.     Beginning at 2:10 p.m., Defendant Clevinger took unauthorized action to transfer super user and group administrative rights from his user account to OCP's administrative user account.  By this unauthorized action, Defendant Clevinger was able to delete his own user account (because a logged in user cannot delete his or her own account).

43.     Through the administrative user account, Defendant Clevinger deleted his own OCP user account – and along with it over five years of OCP email, calendar, files, and contact data.  This OCP data is especially important to OCP because it five years' worth of OCP's CEO files.

44.     While Defendant Clevinger did return his OCP laptop, it was destroyed internally and inoperable when OCP received it.  All information on Defendant Clevinger's OCP laptop had been destroyed.

45.     OCP received Defendant Clevinger's resignation letter at 3:52 p.m. on February 1, 2023.

III.   **Defendant Clevinger's Secret Competing Businesses And Unlawful Theft of OCP's Business.**

A.   **Defendant Clevinger Uses Superior Campaign Solutions To Grow His Competing Client Base.**

46.   Unbeknownst to OCP until very recently, Defendant Clevinger incorporated Superior Campaign Solutions, LLC ("SCS") in Delaware in or around April 2021 – almost two years before he resigned from OCP.

47.   Defendant Clevinger secretly used SCS to gather OCP subscriptions and develop its own relationships with clients to use OCP's services.

1.   **SCS' Subscription to OCP's Online Services.**

48.   On or about April, 14, 2021, SCS purchased a subscription of OCP's advocacy software.  Defendant Clevinger was OCP's sales representative for this sale.

49.   OCP sent SCS the $4,000 invoice to an office located at 1629 K Street, NW, Suite 300 in Washington, D.C.

50.   SCS paid the invoice by check dated June 10, 2021.  SCS's payment check is written in Defendant Clevinger's handwriting.  *See* **Exhibit 2** (comparing SCS check with Defendant Clevinger personal check).

51.   SCS renewed its subscription to OCP's online advocacy software in April 14, 2022. OCP sent SCS a $4,200 invoice to 1629 K Street, NW, Suite 300 in Washington, D.C.

52.    SCS paid the invoice by check dated April 11, 2022.  *See* **Exhibit 2**.

53.   By subscribing to OCP's subscription service, Defendant Clevinger was able to develop SCS clients to use OCP's products and services.  In other words, Defendant Clevinger began to develop his own client base separate from OCP's client base.

54.   At all relevant times, OCP has used salesforce.com as its client management

service.  Prior to resigning, Defendant Clevinger changed the SCS client profile in OCP's salesforce.com system to "Campaign Solutions," which is a different – but legitimate – business in the industry.  This effectively masked SCS's transactions, at least until OCP uncovered that Defendant Clevinger had changed the profile to hide OCP's transaction history with his company, SCS.

### 2.    SCS Recruits Clients to Use OCP's Services.

55.    On February 14, 2022, SCS purchased an OCP online subscription and advocate acquisition services on behalf of Citizens for Free Speech for $7,500 and $2,500, respectively. Defendant Clevinger was OCP's sales representative for this sale.

56.    OCP sent SCS a $10,000 invoice to 1629 K Street, NW, Suite 300 in Washington, D.C.

57.    Citizens for Free Speech subsequently paid this invoice directly to OCP on February 21, 2022.

58.     On March 2, 2022, the advocate acquisition vendor that supplied Citizens for Free Speech with advocates (Little Brook Media) billed OCP $3,992 – almost *$1,500 less* than what Citizens for Free Speech paid OCP for the advocates.

59.    The advocate acquisition vendor services are typically marked up by the agency – here, SCS – two to three times the vendor's bill to make a profit.  This indicates that Defendant Clevinger, via SCS, billed Citizens for Free Speech much more than $2,500, kept the $1,500 difference between the advocate price and the amount received by OCP, and kept approximately $10,000 on this transaction alone.

60.    On July 19, 2022, SCS purchased additional advocates on behalf of Citizens for Free Speech for $5,000.  Defendant Clevinger was the sales representative for this sale.

61.    OCP sent SCS a $5,000 invoice to 1629 K Street, NW, Suite 300 in Washington,

D.C.

62.     SCS paid the invoice by check dated July 13, 2022.  *See* **Exhibit 2** (check written in Defendant Clevinger's handwriting).

63.     On September 6, 2022, Little Brook Media billed OCP $3,749 for the additional advocates for Citizens for Free Speech. While OCP did not lose money on this transaction, it still indicates that Defendant Clevinger, via SCS, retained approximately $7,000 via marking up these services.

64.     Between March 2022 and February 2023, OCP's advocate acquisition provider, Little Brook Media, billed OCP $23,976.50 for advocate acquisition services provided to SCS. OCP paid Little Brook Media this amount.

65.     OCP, however, only invoiced SCS only $7,500 for advocate acquisition services – a direct loss of over $18,000 and over $40,000 in loss revenue assuming a markup.

66.     In or around the summer of 2022 – and while Defendant Clevinger was still the CEO of OCP – the Firearms Policy Coalition ("FPC") engaged SCS for a $150,000 project.

67.     Based on the dollar amount of the project, and the known needs of FPC, it is clear that the 2022 FPC project was a large-scale advocate acquisition effort to oppose a federal assault rifle ban bill pending in Congress.

68.     OCP could have easily delivered the FPC advocate acquisition project that Defendant Clevinger directed to SCS instead of OCP.

69.     In the summer of 2021, FPC had engaged OCP for advocate acquisition services. FCP has not engaged OCP for advocate acquisition services since that time.

70.     As a direct result of Defendant Clevinger directing the large-scale advocate acquisition project to SCS, it diverted $150,000 in business from OCP to SCS.

B.    **Defendant Clevinger Secretly Establishes CiviClick.**

71.    Also unbeknownst to OCP until very recently, Defendant Clevinger incorporated CiviClick on July 21, 2022.  Defendant Clevinger is the Founder and CEO of CiviClick, Inc.

72.    CiviClick's principal place of business is 1629 K Street, NW, Suite 300 in Washington, D.C. – the same location where OCP sent invoices to SCS.

73.    CiviClick claims to bring revolutionary data and technology solutions to public affairs professionals for use in their daily professional life.

74.    As part of its business, CiviClick offers an online grassroots advocacy software subscription to customers, advocate acquisition services, and advocate advisory services.

75.    CiviClick's advocacy software is ***almost identical*** to OCP's advocacy software.  A comparison of the OCP subscription software dashboard and CiviClick's subscription software dashboard is attached as **Exhibit 3**.

76.    Design in DC is the development firm that developed and hosts CiviClick.  OCP believes that Defendant Clevinger provided Design in DC with OCP's proprietary codes and customer information obtained from his time as OCP CEO and as the secret owner of OCP's customer, SCS.

77.    In the past few weeks, OCP has learned that Defendant Clevinger has notified numerous OCP clients that he established CiviClick approximately two years ago.  His conduct and industry rumors indicate that he, through his company CiviClick, seeks to steal all of OCP's business.

78.    As an initial matter, CiviClick stole OCP's standard subscription service agreement and converted it into its own service agreement.  A copy of CiviClick's standard service agreement (with OCP client National Hookah Community Association) is attached as **Exhibit 4**.  It is obvious

that CiviClick converted OCP's service agreement to its own because CiviClick's service agreement still includes a reference to OCP.  **Exhibit 4** at 2 ¶ 10.

79.    While still CEO of OCP, Defendant Clevinger also solicited high-level OCP employees to join him.

80.    For example, Mr. Chris Tosto was OCP's Director of Strategic Services ("DSS") from April 2022 until his resignation in February 2023.

81.    While acting as OCP's DSS, Mr. Tosto provided sales, sales support, customer support, business development, customer software onboarding, advocate acquisition support, collections, advisory services.  Mr. Tosto had access to all customer data, customer contact information, and sales information.

82.    As alleged above, Defendant Clevinger deleted Mr. Tosto's OCP user account in the hours before he submitted his resignation on February 1, 2023.

83.    In February 2023, CiviClick hired Mr. Tosto as Vice President of Client Services.

84.    CiviClick's online services went "live" on March 1, 2023.

C.    **Defendant Clevinger's Successful Attempts to Steal OCP's Business.**

1.    **National Hookah Community Association.**

85.    The National Hookah Community Association ("NHCA") has been OCP's client since March 2021.  Each year, NHCA has subscribed to OCP's online advocacy service for $10,000.

86.    On March 19, 2023, OCP invoiced NHCA for its software subscription renewal. **Exhibit 5**.

87.    Unbeknownst to OCP, however, on March 8, 2023, NHCA signed a one-year annual subscription agreement with CiviClick for $7,500.  **Exhibit 4**.

88.     As a result, NHCA dropped its subscription to OCP's online advocacy service.

89.     When OCP learned that NHCA would not renew its subscription, it contacted NHCA to determine why.

90.     Ms. Rima Khoury, one of NHCA's board members, informed OCP that Defendant Clevinger had informed NHCA that he "had the authority to transfer accounts [from OCP] to the new [CiviClick] platform."

91.     As a result of Defendant Clevinger's theft of OCP's customer, NHCA, OCP lost at least $10,500 in business.

2.     **Yamaha Motor Company**.

92.     The Yamaha Motor Company ("YMC") has been an OCP client since December 2021.

93.     YMC paid OCP a total of $36,000 for OCP services during 2022. Included in that amount was $24,000 for an annual subscription to the OCP software, $5,000 for advocate acquisition services, and $7,000 for advisory services.

94.     On January 15, 2023, YMC notified OCP that it would renew its annual contract for $37,000.

95.     Suddenly, on February 6, 2023, YMC advised OCP on that it was not going to renew its contract because it had "come to our attention some major changes are underway at One Click Politics." **Exhibit 6**.

96.     OCP has since learned that Defendant Clevinger was assisting YMC with its OCP login and data file on February 9, 2023.

97.     On February 14, 2023, Defendant Clevinger directly solicits YMC for a "new contract in place between Yamaha and CiviClick." **Exhibit 7** (emphasis in original).

98.     Defendant Clevinger also states that CiviClick is "going live" on March 1, 2023. It

did.

99.    As a result of Defendant Clevinger's theft of OCP's customer, YMC, OCP lost at least $37,000 in business.

### 3.    Firearm Policy Coalition.

100.    The Firearm Policy Coalition ("FPC") has been an OCP customer since 2021.

101.    Each year, FPC has purchased an annual subscription to OCP's online advocacy software for $22,000.

102.    On or about February 15, 2023, an employee of FPC informed OCP that Defendant Clevinger had approached FPC and offered to "migrate" it to CiviClick in March 2023.

103.    The employee also informed OCP that Defendant Clevinger told FPC that OCP was "closing."

104.    FPC previously indicated to OCP that it would maintain its relationship with OCP. FPC's annual subscription was set to renew on March 16, 2023.

105.    On March 12, however, FCP informed OCP that it will not be renewing its annual subscription.

106.    Around this time, FCP informed OCP that SCS was Defendant Clevinger's "side hustle."  It also revealed to OCP that it had engaged SCS in the summer of 2022 for a $150,000 project.

107.    As a result of Defendant Clevinger's theft of OCP's customer, FPC, OCP lost at least $22,000 in business (in addition to the lost $150,000 project from the summer of 2022).

### 4.    Shawmut Strategies Group.

108.    The Shawmut Strategies Group ("SSG") has been an OCP customer since 2020.

109.    Each year, SSG has purchased an annual subscription to OCP's online advocacy software for $11,500,

110.    SSG's subscription was set to renew on December 18, 2022.

111.    OCP received SSG's annual subscription check on February 9, 2023.

112.    OCP deposited SSG's check on February 16, 2023.

113.    OCP was notified on February 22, 2023, that SSG had put a stop payment on the check.

114.    OCP asked SSG why it had stopped payment only days after sending OCP the check. SSG simply responded that it was "holding off on a renewal."

115.    Upon information and belief, Defendant Clevinger persuaded SSG to stop payment on the check and stole SSG as a customer.

116.    As a result of Defendant Clevinger's theft of OCP's customer, SSG, OCP lost at least $11,050 in business.

> **5.     Citizens for Free Speech.**

117.    Citizens for Free Speech has been an OCP customer since February 11, 2022 (through Defendant Clevinger's SCS entity).

118.    In 2022, Citizens for Free Speech paid OCP $10,000 for its software subscription and advocate acquisition services.

119.    Citizens for Free Speech has not attempted to renew with OCP for 2023.

120.    Upon information and belief, Citizens for Free Speech followed Defendant Clevinger to CiviClick.

121.    As a result of Defendant Clevinger's theft of OCP's customer, Citizens for Free Speech, OCP lost at least $10,000 in business.

> **6.     FreedomWorks.**

122.    In March 2022, FreedomWorks signed up for a two-year online advocacy subscription for $40,000 per year. **Exhibit 8**.

123.    OCP spoke with FreedomWorks on March 9, 2023, and FreedomWorks did not indicate that it sought to terminate its subscription early.

124.    Also on March 9, OCP intercepted an email from FreedomWorks to Defendant Clevinger's OCP email account, indicating that Defendant Clevinger had been working with FreedomWorks.  **Exhibit 9**.

125.    On March 23, FreedomWorks notified OCP that it was terminating its relationship with OCP one year early, citing "current issues with your platform."  **Exhibit 10**.

126.    Defendant Clevinger has a close relationship with the FreedomWorks Chief Technology Officer.

127.    Upon information and belief, Defendant Clevinger successfully stole FreedomWorks from OCP.

128.    As a result of Defendant Clevinger's theft of OCP's customer, FreedomWorks, OCP lost at least $40,000 in business.

### 7.    **People for Opportunity**.

129.    People for Opportunity (PFO) is a non-partisan organization committed to seeing communities move closer each day to the ideal of equality of opportunity for all citizens.  It works to educate and engage citizens and policymakers toward realizing this objective.

130.    On January 23, 2023, OCP invoiced PFO $12,000 for an annual subscription to begin on that same date.  **Exhibit 11**.

131.    PFO delivered a $12,000 check dated January 31, 2023 to OCP.

132.    On February 6, 2023, PFO placed a stop payment on the check.

133.    PFO is no longer a customer of OCP.

134.    Based on the significant evidence of Defendant Clevinger's misconduct, OCP

believes that PFO is now a customer of CiviClick.

135. If true, Defendant Clevinger's theft of OCP's customer, PFO, caused OCP to lost $12,000 in business.

**8.    LegiNation.**

136. LegiNation, Inc (d/b/a BillTrack50) ("BT50") provides online legislation and regulation research for all 50 states.

137. OCP resells BT50 as its bill tracking service.

138. OCP's business relationship with BT50 was established in 2020, while Defendant Clevinger was CEO of OCP.

139. Between October 2020 and December 2021, OCP paid BT50 approximately $100,000 for its services which were resold to approximately 30 customers.

140. OCP recently learned from BT50 that Defendant Clevinger personally received "royalty" payments from BT50 totaling $9,440 in 2020 and 2021.

141. According to OCP's conversations with BT50, BT50 stopped this practice of paying Defendant Clevinger the "royalty" payments and asked Defendant Clevinger if it could pay OCP directly.

142. Defendant Clevinger declined on behalf of OCP.

143. As a result of Defendant Clevinger's retention of "royalty," payments, OCP was deprived of that income, totaling $9,440.

**9.    Lost Advocacy Acquisition Services.**

144. For the past five years, OCP has prominently displayed its advocate acquisition services tab on its website.

145. In 2021 alone, OCP's revenues derived from its advocate acquisition services

totaled $1,223,047.50.

146. After learning from FPC that SCS was Defendant Clevinger's "side hustle," and that Defendant Clevinger diverted a $150,000 advocacy acquisition opportunity from OCP to SCS, OCP investigated its revenues more closely.

147. OCP's investigation revealed a significant drop in advocacy acquisition revenues in 2022. Specifically, OCP only received $545,950 in advocacy acquisition services revenues for 2022.

148. During its recent investigation, OCP discovered that in October 2022, while he was still OCP's CEO, Defendant Clevinger directed OCP's technical team to delete two complete web pages describing two of OCP's primary services – advisory acquisition services and advisory consulting – from OCP's website. **Exhibit 12**.

149. Removing these two core competencies from OCP's website permitted Defendant Clevinger to more effectively sell those services through his competing company.

150. This represents a loss of $677,097.50 in lost advocacy acquisition revenues.

151. As a direct result of Defendant Clevinger removing references to a major source of revenues, he was able to divert a large sum of advocacy acquisition business to SCS and CiviClick.

152. The significant drop in revenues for this service, coupled with SCS's known theft of this service in the summer of 2022, indicates that Defendant Clevinger diverted at least $500,000 in advocacy acquisition services to his companies, SCS and CiviClick (in addition to the diverted $150,000 FPC project).

D. **Defendant Clevinger's Unsuccessful Attempts to Steal OCP's Business**.

1. **The Zoldak Agency**.

153. The Zoldak Agency is a public affairs firm that manages the campaigns of its clients to help its clients advocate to pass or defeat legislation. The Zoldak Agency uses multiple

advocacy software tools including OCP to assist its clients.

154.    The Zoldak Agency has had a relationship with OCP since 2019.

155.    Approximately 12 of the Zoldak Agency's clients have used and continue to use the OCP subscription software.

156.    Ms. Sue Zoldak, the principal of the Zoldak Agency, attended a public affairs advocacy conference in Florida on or about February 7, 2023.

157.    OCP was supposed to sponsor an evening event (the VIP By The Sea) on February 7, 2023, at that conference and thus an invitation was created.  **Exhibit 13**.

158.    After he resigned from OCP on the afternoon of February 1, 2023, however, Defendant Clevinger usurped OCP's sponsorship of the event.

159.    In the early morning of February 1, 2023 (obviously knowing he was resigning that day), Defendant Clevinger increased the number of persons at the event to 150.  **Exhibit 13**.

160.    Then, Defendant Clevinger sponsored the event on behalf of CiviClick, and not OCP.

161.    On February 11, Defendant Clevinger asked to be invoiced $2,500 for CiviClick's sponsorship of the event.

162.    Ms. Zoldak saw Defendant Clevinger at that evening event.  Ms. Zoldak was surprised to see Defendant Clevinger at what was supposed to be an OCP-sponsored event because he abruptly terminated his employment with OCP only days earlier on February 1, 2023.

163.    Defendant Clevinger approached Ms. Zoldak at the evening event and told her that he "had been working on another company for the past two years."

164.    Defendant Clevinger then falsely informed Ms. Zoldak that OCP was withdrawing from the advocacy space and "pivoting" to the environmental, social, and governance (i.e.,

corporate social responsibility) space.

165.    Defendant Clevinger then directly solicited Ms. Zoldak by stating "I'm willing to transfer all of your OCP clients to the new [CiviClick] platform for free.  Let's set up a call.  I'm doing this for all of our other clients as well."

166.    Defendant Clevinger also falsely informed Ms. Zoldak that he did not have a noncompete agreement with OCP.

### 2.    American Firearms Association.

167.    American Firearms Association ("AFA") has been an OCP customer since 2020.

168.    Each year, AFA has purchased an annual subscription to OCP's online advocacy software for approximately $40,000.

169.    On or about February 13, 2023, a member of AFA's board of directors informed OCP that Defendant Clevinger had approached him and informed him that OCP was ceasing operations.

170.    Defendant Clevinger asked AFA to terminate its relationship with OCP and use CiviClick instead.

171.    Fortunately, OCP was able to assure AFA that OCP was not ceasing operations and ensured no disruptions in service.

### 3.    NAIOP SoCal.

172.    NAIOP SoCal is southern California's leading commercial real estate association.

173.    NAIOP is a current customer of OCP.

174.    On February 5, 2023, Defendant Clevinger contacted NAIOP to sell CiviClick. **Exhibit 14**.

175.    In response, NAIOP asked Defendant Clevinger "Did you sell One-Click or is

CiviClick the successor product?" **Exhibit 14**.

176.    Defendant Clevinger simply responded "CiviClick is the new product." **Exhibit 14**.

177.    NAIOP expressed interest in a demonstration of CiviClick.

178.    NAIOP has not renewed its relationship with OCP yet.

**III.    CiviClick's Actual and Continued Threatened Harm To OCP.**

179.    CiviClick went "live" on March 1, 2023.

180.    The examples of Defendant Clevinger's theft and attempted theft of OCP's business have been gathered in a very short period of time.

181.    OCP has learned from a number of sources in the closely-knit legislative advocacy space that Defendant Clevinger is attempting to steal as many OCP clients as possible.

182.    OCP believes that CiviClick has been successful in stealing other clients through Defendant Clevinger's false statements that OCP is "closing" or moving out of the advocacy space.

183.    OCP, however, will not learn of the theft until OCP's current clients' subscriptions are not renewed.

184.    Defendant Clevinger destroyed an enormous amount of OCP data when he resigned.  Essentially five years' of files of OCP's CEO are forever deleted.  This caused an incalculable amount of damage to OCP.

185.    CiviClick's products and services are nearly identical to OCP's products and services.  CiviClick's business model is exactly the same as OCP's business model.  In short, CiviClick was established by OCP's CEO, while he was CEO, in a brazen effort to not only compete – but replace – OCP in the digital advocacy space.

186.    If successful, Defendant Clevinger could steal up to $1.5 million a year (or more) in OCP's revenues.

187.    There is great urgency in stopping Defendant Clevinger's unlawful theft and continued solicitation of OCP clients and potential clients.  Two large industry conventions are scheduled in March and April 2023.

188.    The first is the Reed Awards & Conference, which occurred March 27 to 28, 2023 in Las Vegas, Nevada.  This event was billed as the "Political Campaign Industry Event of the Year."  It was a key event for OCP to meet in person with over 500 participants including many existing and potential OCP customers.

189.    Defendant Clevinger had not registered for the Reed Awards & Conference.  But, without OCP's prior knowledge, CiviClick sponsored several aspects of the conference and had a representative handing out his business cards.  **Exhibit 15**.

190.    The next large industry conference is the Pollie Conference, hosted by the American Association of Political Consultants.  The Pollie Conference is being held from April 18 to 20, 2023, in Palm Springs, California.  The Pollie Conference is another premier event in the political consulting industry.  It is also a key event for OCP because political consultants have enormous influence on OCP's customers and their selection of digital advocacy tools and related support.

191.    Defendant Clevinger attended these conferences when he was OCP's CEO.  He attempted to develop business while at these heavily-attended conferences.

192.    He will undoubtedly attend the Pollie Conference to develop business for CiviClick.

193.    OCP must protect its business from unlawful competition and malicious and intentional theft of its hard-earned business.  Accordingly, OCP now files this suit seeking of temporary, preliminary, and permanent injunctive relief and damages to remedy Defendant

Clevinger's breach of contract, breach of fiduciary duty, and tortious interference.

## Count I
### (Breach of Contract)

194.    OCP incorporates the allegations contained in paragraphs 1 through 193 herein.

195.    The Noncompete Agreement is a valid and enforceable contract.

196.    CiviClick is a business located in the United States that directly competes with OCP.

197.    Mr. Clevinger breached Paragraph 4 of the Noncompete Agreement by funding, owning, investing in, setting up, and/or starting CiviClick; and by becoming employed by, working for, or otherwise providing services to or on behalf of CiviClick in an executive, management, and/or sales representative capacity.

198.    Mr. Clevinger breached Paragraph 5 of the Noncompete Agreement by soliciting, calling upon, and/or contacting OCP's customers and vendors on behalf of CiviClick for the purpose of engaging in competitive activity; by contracting with, selling to, and/or performing services for OCP's customers and vendors on behalf of CiviClick; and by diverting, interfering with, or attempting to divert or interfere with, OCP's business relationship with its customers and vendors.

199.    Mr. Clevinger breached Paragraph 6 of the Noncompete Agreement by soliciting, inducing or encouraging an OCP employee to terminate his employment with OCP; and by hiring or attempt to hire any OCP employee on behalf of a person or entity engaged in competitive activities.

WHEREFORE, OCP respectfully requests the following relief to remedy Defendant Clevinger's breach of the Noncompete Agreement:

(a)    This Court should temporarily and preliminarily enjoin Mr. Clevinger from

engaging in any activity that competes with OCP, including, but not limited to, any activity on behalf of CiviClick; from soliciting any OCP customers or vendors; and from soliciting any OCP employees; <u>and</u>

(b)    This Court should permanently enjoin Mr. Clevinger from engaging in any activity that competes with OCP, including, but not limited to, any activity on behalf of CiviClick; from soliciting any OCP customers or vendors; and from soliciting any OCP employees for a period of ten months from the date of judgment in this case; <u>and</u>

(c)    This Court should permanently enjoin Mr. Clevinger to shut down CiviClick and ensure that all stolen business is returned to OCP; <u>and</u>

(d)    This Court should award OCP $797,900 in compensatory damages as a direct and proximate result of Mr. Clevinger's breach of the Noncompete Agreement; <u>and</u>

(e)    This Court should award OCP its reasonable attorneys' fees incurred pursuant to Paragraph 11 of the Noncompete Agreement.

<u>**Count II**</u>
**(Breach of Fiduciary Duty)**

200.    OCP incorporates the allegations contained in paragraphs 1 through 193 herein.

201.    As CEO of OCP, Defendant Clevinger had a fiduciary duty to OCP.

202.    Defendant Clevinger breached his fiduciary duty to OCP by stealing and destroying OCP's website and company data, establishing two competing companies with the intent of stealing OCP's business after he resigned and actually diverting business from OCP to SCS and CiviClick.

203.    As a direct and proximate result of Defendant Clevinger's breach of fiduciary duties, OCP has been damaged in an amount equal to at least $797,900.

WHEREFORE, OCP respectfully requests the following relief to remedy Defendant Clevinger's breach of fiduciary duty:

(a)     This Court should award OCP $797,900 in compensatory damages as a direct and proximate result of Mr. Clevinger's breach of fiduciary duty to OCP; <u>and</u>

(b)     This Court should award OCP an additional $350,000 in punitive damages (or any other amount awarded at trial) to punish his malicious, wrongful, and harmful breach of fiduciary duty.

**<u>Count III</u>**
**(Tortious Interference with Contracts)**

204.    OCP incorporates the allegations contained in paragraphs 1 through 193 herein.

205.    OCP has valid and enforceable contracts with NHCA, YMC, FPC, SSG, Citizens for Free Speech, Freedom Works, and LegiNation.

206.    As CEO of OCP, Defendant Clevinger was aware of OCP's contracts with those customers and vendors.

207.    Defendant Clevinger intentionally and unjustifiably induced OCP's customers and vendors to breach their contracts with OCP.

208.    Numerous OCP customers breached or otherwise discontinued their contracts with OCP as a direct and proximate result of Defendant Clevinger's induction.

209.    As a direct and proximate result of Defendant Clevinger's tortious interference with OCP's contracts, OCP has been damaged in the amount of $797,900.

WHEREFORE, OCP respectfully requests the following relief to remedy Defendant Clevinger's tortious interference with OCP's contracts:

(a)     This Court should award OCP $797,900 in compensatory damages as a direct and proximate result of Mr. Clevinger's tortious interference with OCP's contracts; <u>and</u>

29

(b)     This Court should award OCP an additional $350,000 in punitive damages (or any other amount awarded at trial) to punish his malicious, wrongful, and harmful tortious interference.

**Count IV**
**(Tortious Interference with Business Expectancies/Prospective Economic Advantage)**

210.    OCP incorporates the allegations contained in paragraphs 1 through 193 herein.

211.    OCP has meaningful business expectancies with NHCA, YMC, FPC, SSG, Citizens for Free Speech, Freedom Works, and LegiNation.

212.    As CEO of OCP, Defendant Clevinger was aware of OCP's expectancies with those customers and vendors and potential customers and vendors.

213.    Defendant Clevinger intentionally and unjustifiably interfered with those expectancies, causing a breach or termination with those expectancies.

214.    As a direct and proximate result of Defendant Clevinger's tortious interference with OCP's business expectancies, OCP has been damaged in the amount of $797,900.

WHEREFORE, OCP respectfully requests the following relief to remedy Defendant Clevinger's tortious interference with OCP's business expectancies:

(a)     This Court should award OCP $797,900 in compensatory damages as a direct and proximate result of Mr. Clevinger's tortious interference with OCP's business expectancies; and

(b)     This Court should award OCP an additional $350,000 in punitive damages (or any other amount awarded at trial) to punish his malicious, wrongful, and harmful tortious interference.

**Prayer for Relief**

For the foregoing reasons, OCP respectfully requests that this Court (1) ENTER A

TEMPORARY RESTRAINING ORDER prohibiting Defendant Clevinger from competing with OCP (through online advocacy software, providing advocacy acquisition services, providing advocacy consulting, and providing bill tracking services), soliciting OCP's clients, and soliciting OCP's employees; (2) ENTER JUDGMENT in favor of OCP and against Defendant Clevinger for the relief claimed in Counts I through IV of this verified complaint; (3) ENTER a PRELIMINARY INJUNCTION and PERMANENT INJUNCTION mandating Defendant Clevinger to shut down CiviClick and terminate all of its contracts for services and goods; (4) AWARD OCP compensatory damages in the amount of $797,900 plus reasonable attorneys' fees (or any other amount to be determined in this action); (5) AWARD OCP punitive damages in the amount of $350,000 for Defendant Clevinger's intentional and malicious conduct in this case; and (6) AWARD OCP any other relief this Court deems just and proper.

### Jury Trial Demand

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, OCP respectfully requests a trial by jury on all matters so triable.

Dated: March 30, 2023                          Respectfully Submitted,

                                               **ADVOCACY HOLDINGS, INC.**
                                               **d/b/a OneClickPolitics**

                                               **By:**

                                               _(signature)_
                                               _____
                                               Anand Ramana (Virginia Bar No. 65852)
                                               VEDDER PRICE P.C.
                                               1401 New York Ave., N.W.
                                               Suite 500
                                               Washington, D.C. 20005
                                               Tel: (202) 312-3325
                                               E-mail: aramana@vedderprice.com
                                               _Counsel for Plaintiff Advocacy Holdings, Inc._

Eleanor Callaway (admission *pro hac vice* forthcoming)
VEDDER PRICE P.C.
1401 New York Ave., N.W.
Suite 500
Washington, D.C. 20005
Tel: (202) 312-3374
E-mail: ecallaway@vedderprice.com
*Counsel for Plaintiff Advocacy Holdings, Inc.*

## <u>Verification</u>

I, John Koepke, am an authorized agent of the plaintiff in the above-captioned action. I am of sound mind and body to make this verification. I have read the foregoing verified complaint, fully understand the factual allegations, and understand the legal claims OCP is asserting in this action. I verify under penalty of perjury that the foregoing is true and correct.


Executed on March 29, 2023                    _____
                                              John Koepke